Austin Williams (AK Bar No. 0911067)
TROUT UNLIMITED
3105 Lake Shore Drive, Suite 102B
Anchorage, AK 99517
Tel.: 907.227.1590
Austin.Williams@tu.org

Paul A. Werner*
Steven P. Hollman*
Abraham J. Shanedling*
Rachelle P. Bishop*
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, D.C. 20006-6801
Tel.: 202.747.1900
pwerner@sheppardmullin.com
shollman@sheppardmullin.com
ashanedling@sheppardmullin.com
rbishop@sheppardmullin.com

*_Pro hac vice_ application to be filed

_Attorneys for Plaintiff_
Trout Unlimited

## UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

| | |
|---|---|
| TROUT UNLIMITED, | Case No. 3:19-cv-00268-JWS |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, ANDREW WHEELER, in his official capacity as Administrator of the Environmental Protection Agency, MATTHEW Z. LEOPOLD, in his official capacity as General Counsel for the Environmental Protection Agency, and CHRIS HLADICK, in his official capacity as Region 10 Regional Administrator for the Environmental Protection Agency, | **(Administrative Procedure Act, 5 U.S.C. §§ 702–706; Clean Water Act, 33 U.S.C. § 1251 _et seq._)** |
| Defendants. | |

Plaintiff Trout Unlimited ("TU") brings this action challenging a decision of the U.S. Environmental Protection Agency ("EPA") to reverse itself and withdraw a Proposed Determination founded on years of study and scientific research establishing that permitting mining in Alaska's Bristol Bay watershed would cause an unacceptable adverse impact to this precious resource. For its Complaint for Declaratory and Injunctive Relief, TU states and alleges the following:

## PRELIMINARY STATEMENT

1.      This lawsuit centers on the latest development in the saga of a long-proposed mining operation of unprecedented scale and scope—known as the Pebble Mine—in Bristol Bay, Alaska.

2.      The Bristol Bay watershed is a unique and pristine natural resource that is home to abundant wild Pacific salmon populations that support a diverse ecosystem of other fish and wildlife species, one of the largest commercial fisheries in the world generating billions in economic output annually, and a world-class recreational fishing destination, and it has supported traditional ways of life for Alaska Natives for thousands of years.

3.      Despite the unparalleled value of the Bristol Bay watershed as a natural resource to our Nation, a Canadian mining outfit, Pebble Limited Partnership ("PLP"), owned by Northern Dynasty Minerals ("Northern Dynasty"), has long sought to exploit the Pebble deposit located there by opening the largest mining pit in North America—a pit nearly as deep as the Grand Canyon—to extract gold, copper, and molybdenum. Given the prime Pebble deposits are low-grade (meaning the metals to ore ratio is such that mining is only economic if conducted over a large area necessarily producing massive amounts of

-1-

waste material), the proposed mining pit, tailings impoundments, and waste rock piles would span an area as large as the borough of Manhattan.

4.    One does not need to be an environmental or policy expert to know this proposed mining operation in the Bristol Bay watershed is a terrible idea.  The mine has indeed been the subject of profound and long-standing public opposition, and several of the world's leading jewelry companies have vowed never to use any minerals sourced from the mine.  Four prior mining interests have also considered and abandoned the idea.

5.    In 2014, the expert federal agency charged with environmental stewardship and protecting our precious natural resources for current and future generations—the aptly named, Environmental *Protection* Agency—reached the same very conclusion based on close study, hard science, and its expert judgment.  That conclusion was memorialized in EPA's Proposed Determination issued pursuant to Section 404(c) of the Clean Water Act ("CWA").

6.    In reaching that determination and taking action towards blocking development of Pebble Mine, EPA explained the Bristol Bay watershed is "an area of unparalleled ecological value, boasting salmon diversity and productivity unrivaled anywhere in North America."  As the agency further explained, the region is a "globally significant resource with outstanding value" that "provides intact, connected habitats— from headwaters to ocean—that support abundant, genetically diverse wild Pacific salmon populations" that in turn "maintain the productivity of the entire ecosystem, including numerous other fish and wildlife species."  And EPA concluded the Bristol Bay watershed

is "one of the last places on Earth with such bountiful and sustainable harvests of wild salmon."

7.     Even under the rosiest, most conservative scenario, EPA determined the mine would be ecologically and environmentally ruinous to the Bristol Bay watershed. The mine would result in miles and miles of lost and diverted waterways and wetlands and fouled and poisoned waters that would destroy habitats and kill fish populations, which, in turn, would have cascading harmful impacts on other wildlife populations, economic activities, and ways of life in the region.  Based on these and other anticipated profound harms, EPA concluded in its Proposed Determination the proposed mine, and its related economic development and infrastructure, would likely have significant and unacceptable adverse effects on the region's environment and economy.  Based on scientific and technical findings, EPA's Proposed Determination thus reflected the agency's judgment and decision to block the mine from ever getting underway.

8.     EPA's findings and conclusions were based the agency's earlier 2014 Watershed Assessment, which was conducted by a large group of scientists and experts who limited their analysis to the scientific study of mining effects, rather than policy, legal, or regulatory considerations.  EPA evaluated the significance of the Bristol Bay watershed's ecological resources and potential impacts of the proposed mining operations based on various-sized scenarios of the amount of ore processed over a certain number of years.  And even under the most conservative estimates of only 250 million tons of ore in 20 years, EPA concluded that planned mining would result in unacceptable environmental and ecological devastation: 24 miles of lost streams, including 5 miles known to provide

Case 3:19-cv-00268-SLG   Document 1   Filed 10/09/19   Page 4 of 55

spawning or rearing habitats for salmon and other indigenous fish species; 1,200 acres of lost wetlands; 100 miles of lost ponds and lakes, further affecting off-channel habitats for salmon and other fish; and toxicity levels fatal to fish in at least 13 miles of streams, among many other impacts.

9.    The Proposed Determination reiterated science-based findings of loss and harm to the Bristol Bay ecosystem. But it also went further: EPA also recognized the agency's previous assessment severely understated potential adverse effects on resources because it did not account for footprint impacts associated with construction and operation of the mine, like a transportation corridor and natural gas pipeline, nor did it consider potential accidents during construction and mining activities, or the full extent of toxicity caused by the minerals if they entered water supplies—a perpetual risk of the "tailings" created by mining activities.

10.    Despite the change of presidential administrations and subsequent political initiation of a review to withdraw the Proposed Determination, last year then-Administrator Scott Pruitt reaffirmed EPA's Proposed Determination, suspending the withdrawal process. In the agency's "Suspension Decision," Administrator Pruitt stated: "[I]t is my judgment at this time that any mining projects in the region likely pose a risk to the abundant natural resources that exist there. Until we know the full extent of that risk, those natural resources and world-class fisheries deserve the utmost protection." He further explained "for EPA not to express an environmental position at this stage would be disingenuous" and that the Suspension Decision "demonstrates the Agency's commitment

Case 3:19-cv-00268-SLG   Document 1   Filed 10/09/19   Page 5 of 55

to both the rule of law and process, and upholding the EPA's core mission of environmental stewardship."

11. And, just this past July, EPA submitted comments on a draft Environmental Impact Statement on the project, stating "[b]ecause the nature and extent of the proposed discharges reflect some of the most highly significant and complex discharge activities with the potential for serious adverse impact contemplated by [applicable regulations], the level of information, evaluation, and documentation necessary for this project to demonstrate compliance with the Guidelines is significant." EPA's assessment was that the evidence was insufficient to support a conclusion that the proposed discharges would comply with guiding regulations, and instead supported the conclusion that PLP's proposed mining "may have substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds, which are aquatic resources of national importance."

12. Despite all of EPA's earlier and thoroughgoing scientific evaluations and judgments that law and process required it to meet its statutory obligations by taking a stance against and moving to block the proposed mine, EPA dramatically reversed itself on August 30, 2019. Without any further development of the scientific record underpinning its previous judgment that the proposed mine would cause unacceptable adverse harm, EPA withdrew its 2014 Proposed Determination to restrict use of certain areas as a disposal site in the Pebble deposit in the headwaters of Bristol Bay, Alaska, 84 Fed. Reg. 45,749 (Aug. 30, 2019) ("Withdrawal Decision") (Exhibit ("Ex.") A).

13. EPA's sudden action is a total about-face after more than a half-decade of the agency's science-based and authoritative opposition to the proposed Pebble Mine at

CASE NO. 3:19-cv-00268-JWS
TROUT UNLIMITED v. U.S. EPA, et al.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

Case 3:19-cv-00268-SLG   Document 1   Filed 10/09/19   Page 6 of 55

Bristol Bay, which continuously reaffirmed findings the proposed mine would cause unacceptable adverse effects on the aquatic ecosystems in Bristol Bay.

14.     In the face of the established record and its own judgment, the Withdrawal Decision nevertheless declares "now is the appropriate time to complete the withdrawal of the Proposed Determination in light of developments in the record and the availability of processes for EPA to address record issues with the U.S. Army Corps."

15.     But EPA provides only two reasons for its profound reversal in course, and neither withstands scrutiny.

16.     *First*, EPA announced that "significant project-specific information that was not accounted for in the 2014 Proposed Decision" has come to light.  But new information about the mine alone does not support the agency's changed position.  As Administrator Pruitt acknowledged just last year, the agency's Proposed Determination in no way prevents the agency from considering new evidence as the record develops.  Nor did the agency even consider the new information in light of the existing record or how it bore on its earlier analysis and conclusions.  Instead, after years of scientific study, the agency took the startling position that it was not appropriate, in the context of the Withdrawal Decision, to consider technical or scientific data to determine whether mining would lead to unacceptable adverse effects on aquatic ecosystems and meet the Clean Water Act's 404(b) Guidelines.  In other words, the agency said that it would be inappropriate to consider how or why the new evidence impacted its decision to withdraw its earlier decision based on record evidence and analysis.  For reasons unknown, EPA simply eschewed its cumulative evidence-based determination of "unacceptable adverse

effects" under the Clean Water Act, Section 404(c), and abandoned the standard upon which every prior EPA decision related to Pebble Mine was founded.

17.     Had the agency bothered to consider the new evidence, moreover, it would have found that it provided no basis for reversing its longstanding judgment.  To the contrary, PLP's permit application, submitted after the Proposed Determination, is for a mine *six times larger* than the smallest scenario evaluated by EPA—a scenario that EPA determined likely would trigger unacceptable adverse effects.

18.     Consequently, EPA has wholly failed to explain why it cannot keep the Proposed Determination in place as the record develops, why science and data is not necessary to support its own science- and data-backed decision, and how any newly-submitted record evidence justifies a withdrawal of its longstanding Proposed Determination.

19.     *Second*, EPA stated that a withdrawal is warranted because it now prefers to defer to the Army Corps of Engineers ("Corps") and other processes to develop the evidentiary record.  But EPA failed to offer any reasonable explanation for its changed view on the proper procedural approach to evaluating the mine as reflected in the Proposed Determination, or even why it was now required to withdraw the Proposed Determination in favor of other procedures.  Nor could the agency reasonably do so.  Just a year ago in the Suspension Decision, EPA explicitly stated that factual development "does not support withdrawal of the Proposed Determination at this time."  And there is no reason why any other appropriate processes contemplated by the agency could not proceed while the Proposed Determination remained in place.  EPA offered no explanation for why it could

not.  The agency cannot support its changed policy merely by noting that the agency may change its mind in the future.  Such agency whimsy is the quintessence of arbitrary and irrational decision-making.

20.    EPA's capriciousness is also flatly barred by the CWA.  Rather than deferring to the judgment of another agency, the CWA dictates EPA must consider the mine's unacceptable adverse effects on aquatic ecosystems under the 404(b) Guidelines. EPA does not acknowledge or meet these obligations in its Withdrawal Decision.

21.    The upshot is EPA and its officers—the very agency and individuals charged with environmental protection—have abdicated their statutory duties to consider the unacceptable adverse effects of mining on Bristol Bay and the ecosystems it supports. Instead, they have irrationally and unlawfully stepped aside to clear the way for another agency to enable the mine.  But political expediency is no substitute for sound and rational agency judgements, and EPA cannot simply ignore its statutory obligations or change its longstanding position in disregard of the record evidence and its own prior scientific findings and expert judgments without any reasonable explanation.

22.    The unacceptable adverse impacts that EPA recounted time and time again, in all its prior decisions on Pebble Mine, will cause irreparable injury to the Bristol Bay waterways and adversely affect the way of life of Alaska's citizens and communities, especially to those directly in the Bristol Bay area.  TU brings this suit to prevent that cataclysmic and unlawful outcome.

## Plaintiff

23.     TU is the nation's largest sportsman's organization dedicated to coldwater conservation, with more than 400 chapters and 300,000 active members and supporters nationwide.  In Alaska alone, TU has more than 20,000 members and supporters.

24.     Many of TU's members rely on the important fish, wildlife, and water resources found in the Bristol Bay region for fishing, hunting, and recreation, and for employment in related industries.  TU's membership includes passionate anglers, lodge owners, fishing and hunting guides, subsistence users, commercial fishers, tourists, and Alaskans from a variety of walks of life, who live and operate in, or regularly visit, the Bristol Bay region.

25.     TU has worked for over more than a decade to protect Bristol Bay's world-class fisheries and the many rivers, streams, and lakes that sustain them.  TU has participated in the relevant administrative proceedings before EPA, the Corps, and other agencies, and has litigated before courts, all in service of protecting the Bristol Bay region from threats posed by Pebble Mine.

26.     TU submitted comments on EPA's Proposed Determination and the agency's proposal to withdraw the Proposed Determination.

27.     TU, its staff, and its members and supporters have entrenched recreational, economic, aesthetic, scientific, and cultural interests in preserving the world-class natural resources in the Bristol Bay area, including the Pebble deposit area.  The development of the Pebble Mine poses serious and substantial risks of harm to such interests.

28.     EPA's withdrawal of its 2014 Proposed Determination has caused and will continue to cause actual, concrete harm to the interests of TU, its staff, and its members. Because the Proposed Determination prevented the Army Corps from issuing a Section 404 permit, EPA's Withdrawal Decision now has made it easier, and likelier, for the mine to be permitted and developed.  TU's injuries are directly traceable to EPA's decision to withdraw the Proposed Determination, and the relief TU seeks through this litigation would redress that injury.

**Defendants**

29.     Defendant EPA is an executive agency of the United States with the mission "to protect human health and the environment."[1]  As such, the agency's clear mission is to ensure that "Americans have clean air, land and water;" "National efforts to reduce environmental risks are based on the best available scientific information;" "Federal laws protecting human health and the environmental area administered and enforced fairly, effectively and as Congress intended;"  "Environmental stewardship is integral to U.S. policies concerning natural resources, human health, economic growth, energy, transportation, agriculture, industry, and international trade, and these factors are similarly considered in establishing environmental policy"; and "All parts of society—communities, individuals, businesses, and state, local and tribal governments—have access to accurate

---

[1]  EPA, Our Mission and What We Do, https://www.epa.gov/aboutepa/our-mission-and-what-we-do (last visited Sept. 15, 2019).

information sufficient to effectively participate in managing human health and environmental risks."[2]

30. Defendant Andrew Wheeler is the Administrator of EPA. He is sued in his official capacity as the chief officer of the agency. Administrator Wheeler is charged with the supervision and management of all decisions, operations, and activities of EPA. On March 20, 2019, Administrator Wheeler abdicated responsibility for Bristol Bay by recusing himself from EPA's review and permitting decisions related to the proposed Pebble Mine near Bristol Bay, Alaska, because his former law firm represented the mine developer, PLP. Administrator Wheeler made this decision even though he was not personally involved in the representation of PLP and was advised that the client was not considered a "former client" of his for ethics purposes.[3]

31. Defendant Matthew Z. Leopold is General Counsel of EPA. He is sued in his official capacity. Administrator Wheeler delegated to the General Counsel the authority to perform all functions and responsibilities retained by the Administrator or previously delegated to the Assistant Administrator for Water under a 1984 delegation of authority to make final determinations under Section 404(c).

32. Defendant Administrator Chris Hladick is the Region 10 Regional Administrator of EPA. He is sued in his official capacity. The Region 10 Administrator

---

[2] *Id.*

[3] EPA, Memorandum from Andrew R. Wheeler to Assistant Administrators, General Counsel, Inspector General, and Regional Administrators (Mar. 20, 2019), *available at* https://www.eenews.net/assets/2019/03/26/document_gw_01.pdf.

is charged with environmental protection efforts in Alaska. As part of that function, he authored EPA's August 30, 2019, Withdrawal Decision, *Notification of Decision to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska*, 84 Fed. Reg. 45,749 (Aug. 30, 2019).

## JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under federal laws of the United States: The Administrative Procedure Act, 5 U.S.C. §§ 702–706, and the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and its implementing regulations.

34.     Pursuant to 28 U.S.C. §§ 1391(b)(2) & (e), venue is proper in this Court because a substantial part of the events giving rise to the claims set forth herein occurred within the District of Alaska, the lands and waterways at issue are in Alaska, and the Defendants are a United States agency and its officers.

35.     The District Court may hold unlawful and set aside agency action pursuant to 5 U.S.C. § 706 and issue a declaratory judgment and any further necessary or proper relief pursuant to 28 U.S.C. §§ 2201–2202.

## STATUTORY & REGULATORY BACKGROUND

### The Clean Water Act And Its Implementing Regulations

36.     Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress's aim with the CWA was clear: To attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife . . . ." *Id*. § 1251(a)(2).

-12-

37.     To effectuate this goal, the CWA prohibits "the discharge of any pollutant" into waters of the United States without a permit.  *Id.* § 1311.

38.     Section 404 of the CWA delegates to the Secretary of the Army the authority to review and issue permits for discharge of dredged or fill material into navigable waters, but only subject to conditions outlined in Section 404 and binding guidelines established by the Corps and EPA (the "404(b) Guidelines"), codified at 40 C.F.R. Part 230.  *Id.* § 1344.

39.     The 404(b) Guidelines prohibit the permitting of any discharge of dredged or fill material (1) "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem"; (2) if the discharge will cause or contribute to "significant degradation" of the environment; (3) if the discharge will cause or contribute to violations of any water quality standards; and (4) unless "appropriate and practicable steps have been taken which will minimize potential adverse impacts on the aquatic ecosystem."  40 C.F.R. § 230.10.

40.     But EPA wields a veto power throughout the Corps' permitting process. Section 404(c) expressly authorizes the EPA Administrator to "prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site" and "to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an ***unacceptable adverse effect*** on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33

-13-

U.S.C. § 1344(c) (emphasis added). The Administrator must "set forth in writing and make public his findings and his reasons for making *any determination* under this subsection." *Id.* (emphasis added).

41.     EPA's determination of an "unacceptable adverse effect" is governed by the agency's regulations implementing Section 404(c), which define "unacceptable adverse effect" as an "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e). The definition further instructs that, "[i]n evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(l) guidelines." *Id.*

42.     In making a Section 404(c) determination, the EPA Administrator must "take into account all information available to him, including any written determination of compliance with the section 404(b)(1) Guidelines . . . ." 40 C.F.R. § 231.1(a).

43.     The procedures for implementing Section 404(c) are set forth in 40 C.F.R. Part 231. When an EPA Regional Administer "has reason to believe after evaluating the information available to him . . . that an 'unacceptable adverse effect' could result from the specification or use for specification of a defined area for the disposal of dredged or fill material," the Regional Administer may initiate the procedure for a Proposed Determination. *Id.* § 231.3(a).

44.     Following public notice of a Proposed Determination, EPA must provide for a comment period of 30 to 60 days and hold public hearings on the record. *Id.* § 231.4(a).

After close of the public hearing, the Regional Administrator has 30 days to withdraw the Proposed Determination or prepare a Recommended Determination. *Id.* § 231.5(a).

45. The Administrator or the Regional Administrator may extend 404(c) regulations by a showing of "good cause." *Id.* § 231.8.

46. To withdraw a Proposed Determination, the Regional Administrator must notify the Administrator of his intent to do so and notify all persons who commented on the Proposed Determination or participated at any hearing on it. *Id.* § 231.5(c). If the EPA Administrator does not review the withdrawal, the Regional Administrator must give public notice of the withdrawal. *Id.* § 231.5(c)(1). "Such final notice shall constitute final agency action." *Id.*

47. The final determination on the withdrawal decision must "describe the satisfactory corrective action, if any, make findings, and state the reasons for the final determination." *Id.* § 231.6.

48. EPA has explained "there are strong reasons for including this pre-permit authority in the present [Section 404] regulations."[4] These reasons include "facilitat[ing] planning by developers and industry" and "eliminat[ing] frustrating situations in which someone spends time and money developing a project for an inappropriate site and learns at an advanced stage that he must start over."[5] As the agency has explained, advance

---

[4] EPA, Denial or Restriction of Disposal Sites; Section 404(c) Procedures, 44 Fed. Reg. 58,076, 58,077 (Oct. 9, 1979).

[5] *Id.*

prohibition also "facilitiate[s] comprehensive rather than piecemeal protection of wetlands."[6]

## The Administrative Procedure Act

49.     The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." *Id.* § 704.

50.     In actions brought under the APA, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

## <u>FACTUAL BACKGROUND</u>

### Bristol Bay And The World's Premier Salmon Population

51.     Bristol Bay is a gulf in the Bering Sea located in southwestern Alaska. The topography of the Bristol Bay watershed is unique: It is made up of six major watersheds— the Togiak, Nushagak, Kvichak, Naknek, Egegik, and Ugashik River—and several other smaller watersheds. It is nestled between two U.S. National parks, Katmai and Lake Clark, and the nation's largest state park, Wood-Tikchik. The area hosts three active volcanoes and Lake Iliamna, the eighth largest lake in the United States.

---

[6] *Id.*

Case 3:19-cv-00268-SLG   Document 1   Filed 10/09/19   Page 17 of 55

52. In EPA's words, "Alaska's Bristol Bay watershed . . . is an area of unparalleled ecological value, boasting salmon diversity and productivity unrivaled anywhere in North America.  As a result, the region is a globally significant resource with outstanding value."[7]  The watershed "provides intact, connected habitats—from headwaters to ocean—that support abundant, genetically diverse wild Pacific salmon populations," which, in turn, "maintain the productivity of the entire ecosystem, including numerous other fish and wildlife species."[8]



Figure ES-1. The Bristol Bay watershed, composed of the Togiak, Nushagak, Kvichak, Naknek, Egegik, and Ugashik River watersheds and the North Alaska Peninsula. Only selected towns and villages are shown on this map.

---

[7] EPA, Proposed Determination of the U.S. Environmental Protection Agency Region 10 Pursuant to Section 404(c) of the Clean Water Act Pebble Deposit Area, Southwest Alaska, at ES-1 (July 2014) ("Proposed Determination") (Ex. B).

[8] *Id*.

53.     Bristol Bay salmon are the lifeblood of the region's economy, culture, and surrounding communities.  As the evidence of record established and EPA correctly found, the area's "streams, wetlands, and other aquatic resources support world-class, economically important commercial and sport fisheries for salmon and other fishes, as well as a more than 4,000-year-old subsistence-based way of life for Alaska Natives."[9]

---

[9] *Id.*

Case 3:19-cv-00268-SLG   Document 1   Filed 10/09/19   Page 18 of 55



Figure 6 1. Subsistence use intensity for salmon, other fishes, wildlife, and waterfowl within the Nushagak and Kvichak River watersheds.

54.     All five species of wild, North American Pacific salmon inhabit the rivers, streams, and lakes that feed into Bristol Bay.  In the last harvest year alone, 56.3 million

salmon ran through Bristol Bay, and commercial fishermen harvested 43 million fish.[10]

Each year, Bristol Bay supports "the world's largest runs of sockeye salmon, producing

approximately half of the world's sockeye salmon."[11]

55. Bristol Bay is the world's most valuable wild-caught salmon fishery. In

2019, the Bristol Bay commercial salmon catch was the most valuable on record.[12] Annual

salmon returns contribute to the entire region's productivity and biodiversity, and are the

result of the region's high-quality and diverse aquatic habitats, the hydrologic and chemical

connectivity between surface and subsurface waters, and the area's habitat as unaltered by

human-engineered structures and flow management controls.[13] Put simply by EPA:

"Bristol Bay is remarkable as one of the last places on Earth with such bountiful and

sustainable harvests of wild salmon."[14]

---

[10] Isabelle Ross & Alex Hager, Bristol Bay Fisheries Report: August 2, 2019, KDLG.org (Aug. 2, 2019), https://www.kdlg.org/post/bristol-bay-fisheries-report-august-2-2019#stream/0.

[11] Proposed Determination at ES-1.

[12] Isabelle Ross, *At 56.5 million fish, Bristol Bay's 2019 salmon season smashes expectations*, ALASKA PUBLIC MEDIA (Sept. 23, 2019), https://www.alaskapublic.org/2019/09/23/at-56-5-million-fish-bristol-bays-2019-salmon-season-smashes-expectations/.

[13] EPA, An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay Alaska, at ES-8 & ES-5 (Jan. 2014), *available at* https://www.epa.gov/sites/production/files/201505/documents/bristol_bay_assessment_final_2014_vol1.pdf ("Watershed Assessment").

[14] Proposed Determination at ES-1.


The Lower Nushagak River between Portage Creek and Ekwok  Photo: Michael Wiedmer

56.     Native Alaskans have lived in the Bristol Bay region for thousands of years, relying on the bounty of the land and waters to sustain their traditional and customary way of life.  Generations of families have fished commercially in the region, and they continue to rely on subsistence fisheries.[15]

57.     Numerous businesses also rely on Bristol Bay's salmon and resident fish populations.  Anglers, including many TU members, travel from all over the globe to the Bristol Bay region for the opportunity to fish for world-class rainbow trout, Dolly Varden, arctic char, grayling, and the bountiful runs of salmon.  The area boasts at least 29 fish species, more than 40 terrestrial mammal species, and more than 190 bird species, many of which are "essential to the structure and function of the region's ecosystems and current

[15]  *See generally* James A. Fall, et al., *An Overview of the Subsistence Fisheries of the Bristol Bay Management Area*, at 2–3, ADF&G SPECIAL PUBLIC. NO. BOF2009-07 (Nov. 2009), http://www.adfg.alaska.gov/specialpubs/SP2_SP2009-007.pdf.

economies."[16]   Beyond salmon, Bristol Bay's profound bio-diversity and bountiful ecological resources generated nearly $480 million in direct economic expenditures and sales and provided employment for over 14,000 full- and part-time workers in 2009.[17] These figures are on the upswing.

## The Pebble Mine and Its Irreparable Harms

58.     Pebble Mine is a proposed open-pit mining project investigating a copper, gold, and molybdenum deposit in the headwaters of Bristol Bay.

59.     Mining at the Pebble deposit has been considered—and opposed—for a long time.  The project has been abandoned by four major international mining companies: Mitsubishi Corporation (2011),[18] Anglo American (2013),[19] Rio Tinto (2014),[20] and First Quantum Minerals (2018).[21]

---

[16]  Watershed Assessment at ES-5.

[17]  Proposed Determination at ES-1.

[18]  SEC, Northern Dynasty Minerals Ltd. Schedule 13G (Feb. 25, 2011).

[19]  Sarah Childress, *Anglo American Abandons 'Alaska Gold' Mine*, PBS (Sept. 16, 2013), https://www.pbs.org/wgbh/frontline/article/anglo-american-abandons-alaska-gold-mine/.

[20]  Suzanna Caldwell & Alex DeMarban, *Riot Tinto pulls out of Pebble Partnership, gifting its stake to Alaska organizations*, ANCHORAGE DAILY NEWS (July 7, 2016), https://www.adn.com/economy/article/rio-tinto-pulls-out-pebble-partnership-gifting-its-ownership-alaska-organizations/2014/04/08.

[21]  Avery Lill, *Pebble Mine loses funding from First Quantum Minerals*, ALASKA PUB. MEDIA (May 25, 2018), https://www.alaskapublic.org/2018/05/25/pebble-mine-loses-funding-from-first-quantum-minerals/.

CASE NO. 3:19-cv-00268-JWS                                                    COMPLAINT FOR DECLARATORY
TROUT UNLIMITED V. U.S. ET AL.

Case 3:19-cv-00268-SLG   Document 1   Filed 10/09/19   Page 23 of 55

60. Recognizing the importance of Bristol Bay's ecology, the world's most prominent jewelry companies (many of which purchase the very types of minerals found at the Pebble deposit) have vowed not to source any minerals from the Pebble mine.[22]

61. EPA Administrators from the politically diverse administrations of Presidents Nixon, Reagan, George H.W. Bush, Clinton, and George W. Bush have all voiced opposition to the mine, agreeing "[t]he Pebble Mine is the wrong mine in the wrong place."[23]

62. Yet, PLP, which is owned by the Canadian company Northern Dynasty, has persisted in seeking to mine the Pebble deposit. Because the area is not served by any existing infrastructure, PLP also seeks to construct a port at Amakdedori, a transportation corridor, and a natural gas pipeline from the Kenai Peninsula.[24]

63. The proposed mine and its footprint are massive. PLP's ultimate goal in mining the Pebble deposit "is likely to involve the excavation of the ***largest open pit ever constructed in North America***, covering 6.9 square miles . . . and reaching a depth of as

---

[22] *Jewelers Boycott Pebble Mine Gold to Save Bristol Bay Salmon*, ENVIRONMENT NEWS SERVS. (Nov. 4, 2010), http://ens-newswire.com/2010/11/04/jewelers-boycott-pebble-mine-gold-to-save-bristol-bay-salmon/.

[23] Taryn Kiekow Heimer, Former EPA Administrators Say 'NO' To Pebble Mine in DC Ads, NRDC.org (July 2, 2018), https://www.nrdc.org/experts/taryn-kiekow-heimer/former-epa-administrators-say-no-pebble-mine-dc-ads.

[24] Pebble Project Department of the Army Application for Permit, POA-2017-271 (Dec. 2017), *available at* http://pebblescience.org/pdfs/12_22_2017_POA_2017-271_DA_Application_Pebble_Limited_Partnership.pdf ("2017 PLP Permit Application").

much as 0.77 mile."[25]   As reference, the maximum depth of the Grand Canyon is approximately one mile.[26]  EPA has found that disposal of resulting waste material at the proposed mine would require construction of up to three mine tailings impoundments, covering an additional 18.8 square miles and waste rock piles covering up to 8.7 square miles.[27]  The volume of mine tailings and waste rock produced from the smallest mine proposed by Northern Dynasty "would be enough to fill a professional football stadium more than 880 times, whereas the largest mine would do so more than 3,900 times."[28]  In total, the three mine components (mine pit, tailings impoundments, and waste rock piles) would cover an area larger than the borough of Manhattan.[29]

64.    A 2011 SEC filing by Northern Dynasty that set forth plans for the multi-stage development of the mine ranged from a 2.0 billion-ton-mine to a 6.5-billion-ton mine, both of which are larger than 90 percent of the known ore deposits in the world.[30]  And because the prime deposits for mining are low-grade—that is "they contain relatively small

---

[25]  Proposed Determination at ES-2; *see also id*. at ES-10.

[26]  *Id*. at ES-2

[27]  *Id*.

[28]  *Id*.

[29]  *Id*.

[30]  *Id*. (citations omitted); *see also* SEC, Northern Dynasty Minerals Ltd., Schedule 13G (Feb. 25, 2011); Northern Dynasty Minerals Ltd., *Pebble Partnership Releases Environmental Baseline Document* (Feb. 12, 2012) (filed with U.S. Securities and Exchange Commission).

Case 3:19-cv-00268-SLG   Document 1   Filed 10/09/19   Page 25 of 55

amounts of metals relative to the amount of ore"—"mining will be economic only if conducted over large areas and will necessarily produce large amounts of waste material."[31]

65.     Recognizing the cataclysmic risk presented by the prospect of mining in Bristol Bay, numerous groups petitioned EPA in 2010 to stop the proposed project and for the agency to assert its veto authority under Section 404(c) of the CWA to protect Bristol Bay.[32]

66.     In response, EPA undertook a study of potential impacts of large-scale mining on the resources of Bristol Bay, culminating with the January 2014 publication, *An Assessment of Potential Mining Impacts on Salmon Ecosystems of Bristol Bay, Alaska* ("Watershed Assessment"). To address uncertainties regarding the ultimate size of a mine at the Pebble deposit, EPA examined three scenarios for different stages of mining based on the amount of ore processed: Pebble .25 (approximately 250 million, or .25 billion, tons of ore over 20 years); Pebble 2.0 (approximately 209 billion tons of ore over 25 years), and

---

[31]  Watershed Assessment at ES-9.

[32]  *See, e.g.*, Letter from Jason Metrokin, BBNC to EPA Region 10 (Aug. 12, 2010); Joint Letter from Six Tribes to EPA (May 2, 2010); Letter from Alaska Independent Fishermens' Marketing Association to EPA (May 13, 2010); Letter from Bristol Bay Regional Seafood Devt. Ass'n to EPA (June 20, 2010); Bristol Bay Native Association, A Resolution Requesting the EPA to Invoke Section 404(c) of the Clean Water Act as Appropriate in the Kvichak and Nushagak Drainages of the Bristol Bay Watershed to Protect Habitat and Existing Uses, Res. 2010-32 (Sept. 17, 2010). EPA also received 404(c) requests and letters of support from Ekuk Village Council, Clarks Point Tribal Council, Twin Hills Village Council, Alaska Independent Fishermen's Marketing Association, Bristol Bay Regional Seafood Development Association, National Council of Churches, and numerous other sporting and conservation groups.

CASE NO. 3:19-cv-00268-JWS                                    COMPLAINT FOR DECLARATORY
*TROUT UNLIMITED V. U.S. EPA, ET AL.*

Pebble 6.5 (approximately 6.5 billion tons of ore over 78 years). Watershed Assessment at ES-10.

67. These scenarios "reflect the general characteristics of mineral deposits in the watershed, modern conventional mining technologies and practices, the scale of mining activity required for economic development of the resource and the infrastructure needed to support large-scale mining." *Id.* The "mine footprint" assessed is made up of the "area covered by the mine put, waste rock piles, TSFs [tailings storage facilities], groundwater drawdown zone, and plant and ancillary facilities." *Id.* at ES-14.

68. EPA's Watershed Assessment ultimately concluded the Pebble Mine would be ecologically and environmentally ruinous to Bristol Bay. Even under the Watershed Assessment's **most conservative scenario** of developing the mine at the **.25 billion tons of ore level**, EPA found the following harms would occur:

- 24 miles of streams would be "lost—that is, eliminated, blocked, or dewatered," including 5 miles "known to provide spawning or rearing habitats for coho salmon, sockeye salmon, Chinook salmon, and Dolly Varden." *Id.*

- Streamflows would be reduced or altered, which would adversely affect habitat in an additional 9.3 miles of streams, reducing production of sockeye salmon, coco salmon, Chinook salmon, rainbow trout, and Dolly Barden. *Id.* "Reduced streamflows would also result in the loss or alteration of an unquantifiable area of riparian floodplain wetland habitat due to loss of hydrologic connectivity with streams." *Id.*

- 1,200 acres of wetlands and 100 miles of ponds and lakes would be lost, further affecting off-channel habitats for salmon and other fishes. *Id.*

- Water would become increasingly toxic from the runoff and leakage of leachates from the waste rock piles and TSFs, "caus[ing] direct effects on salmonids ranging from aversion and avoidance of the contaminated habitat to rapidly induced death of many or all fish." *Id.* at ES-15. Copper alone would cause death or reduced reduction of quadratic invertebrates in 13 miles of streams. *Id.*[33]

69. These are but a few of the estimated losses under the conservative .25 billion scenario. EPA's 2014 Watershed Assessment further evaluated aquatic environments impacted by construction of the transportation corridor and potential failures and risks of the project, to include ore-carrying truck accidents, a tailings dam failure, pipeline failure, and other common mode failures—all of which could increase toxicity and cause cumulative effects on salmonid and other fish populations. *Id.* at ES-15–ES-25.

70. Worse still, these effects would reverberate and affect brown bears, wolves, bald eagles, and other wildlife that consume salmon as well as Alaskans who rely on subsistence and enjoy sport fishing. *Id.* at ES-25–ES-27.

---

[33] According to EPA, "during routine operations," without any system failure or catastrophic event and no matter how effectively the wastewater treatment system was working, water contaminated with copper and other toxic metals "would enter streams" and "water quality would be diminished" through "uncollected runoff and leakage of leachates from the waste rock piles and TSFs." Watershed Assessment at ES-15.

71.     EPA's Watershed Assessment was also only a scientific assessment, and thus did "not discuss or recommend policy, legal, or regulatory decisions."  *Id.* at ES-1.  But the agency's findings did prompt and form the basis for such decisions.

### EPA Issues A Proposed Determination, Finding "Unacceptable Adverse Effect" To Aquatic Ecosystems In The Bristol Bay Watershed

72.     On February 28, 2014, EPA announced the opening of the Section 404(c) process by issuing a letter to PLP, the Corps, and the State of Alaska.[34]  EPA stated it was taking the step to "review potential adverse environmental effects" of mining because "it has reason to believe that porphyry copper mining of the scale contemplated at the Pebble deposit would result in significant and unacceptable adverse effects to important fishery areas in the watershed."[35]

73.     In a press release, EPA further explained its decision to initiate the 404(c) process, noting the action "reflects the unique nature of the Bristol Bay watershed as one of the world's last prolific wild salmon resources and the threat posed by the Pebble deposit, a mine unprecedented in scope and scale."[36]

74.     In the public process leading up to a proposed determination, EPA reviewed more than a 1,500-page response from PLP, hundreds of thousands of public comments,

---

[34]  Letter from EPA Region 10 to Thomas Collier, CEO, PLP; Joe Balash, Commissioner, Alaska Department of Natural Resources; Colonel Christopher D. Lestochi, Commander, Army Corps of Engineers Alaska District (Feb. 28, 2014), *available at* https://www.epa.gov/sites/production/files/2014-02/documents/bristol-bay-15day-letter-2-28-2014.pdf.

[35]  *Id.*

[36]  EPA Press Release, *EPA moves to protect Bristol Bay fisher from Pebble Mine* (Feb. 28, 2014), https://yosemite.epa.gov/opa/admpress.nsf/names/r10_2014-2-28_bristol_bay.

as well as technical and scientific assessments of impacts to the aquatic ecosystems. More than 99 percent of all public comments supported issuing a proposed determination. Based on the record and technical and scientific data (32 pages of references alone in the Proposed Determination), including that described in the Watershed Assessment (a whopping 72 pages of references), EPA Region 10 concluded it was not satisfied that no unacceptable adverse effects could occur under any mining scenario, and it proceeded under 404(c) regulations to issue a Proposed Determination in July 2014. Proposed Determination at 2-14.

75.     EPA's 2014 Proposed Determination restricted "discharge of dredged or fill material related to mining the Pebble deposit into waters of the United States within the potential disposal site that would, individually or collectively, result in" loss of streams, wetlands, lands, ponds, or alter streamflow of varying degrees. *Id.* at 5-1.

76.     As EPA explained, "[t]o protect important fishery areas in the SFK, NFK, and UTC watersheds from unacceptable adverse effects, EPA Region 10 recognizes that losses of streams, wetlands, lakes, and ponds and alterations of streamflow *each* provide a basis to issue this Section 404(c) proposed determination." *Id.* at ES-5 (emphasis added).

77.     In its Proposed Determination, EPA relied on Northern Dynasty proposals to develop 2.0- and 6.5-billion-ton mines, and EPA's evaluation of the .25-billion-ton mine, to conclude that "mining of the Pebble deposit at any of these sizes, *even the smallest*, could result in significant and unacceptable adverse effects on economically important streams, wetlands, lakes, and ponds and the fishery areas they support." *Id.* (emphasis added).

78.     EPA found the loss of headwaters would "fundamentally alter surface and groundwater hydrology and, in turn, the flow regimes of receiving—or formerly receiving—streams." *Id.*  The damage to off-channel habitats and lost streams "would no longer support or export macroinvertebrates, which are a critical food source for developing alevins, juvenile salmon, juvenile northern pike, and all stages of other salmonids and forage fish." *Id.* at 4-9.

79.     The .25 billion scenario "would eliminate or dewater nearly 5 miles of streams with documented occurrence of anadromous fish" and would result in the elimination, dewatering, or fragmenting of approximately 19 miles of tributaries to anadromous fish streams. *Id.* at 4-4 & 4-19.  In the agency's judgment, this would have "an unprecedented impact in Alaska" with effects that would "reverberate to downstream habitats and affect species such as coho, Chinook, sockeye, and chum salmon." *Id.* at 4-19.  EPA also estimates the loss of 1,200 acres of wetlands, lakes, and ponds, of which 1,100 acres are contiguous with anadromous streams or their tributaries. *Id.* at 4-20.

80.     The .25 billion scenario would also consume large volumes of water drawn from the surface and groundwater sources, resulting in significant alterations to streamflow. *Id.* at 4-22.  Flow would be reduced in more than 45 miles of streams. *Id.* at 4-23.  Drawdown would alter streamflow by more than 20% in about 9 miles of stream, further piling on to the unacceptable adverse impacts to fisheries. *Id.* at 4-28.

81.     Worse still, EPA recognized its Proposed Determination "underestimated potential adverse effects on resources" because it did "not include footprint impacts associated with all the components necessary to construct and operate such a mine (e.g., a

major transportation corridor, pipelines, a power-generating station, wastewater treatment plants, housing and support services for workers, administrative offices, and other infrastructure"); did "not rely upon impacts resulting from potential accidents and failures as a basis for [EPA's] findings"; and recognized "[k]nown compensatory mitigation techniques [would be] unlikely to offset impacts of the nature and magnitude described in the proposed restrictions." *Id.* at ES-6–ES-7.

82. Throughout the Proposed Determination, EPA Region 10 "exercise[d] its discretion to define the potential disposal site as narrowly as possible to encompass the area where discharges associated with mining the Pebble deposit will likely occur, while simultaneously protecting fishery area from unacceptable effects related to such mining." *Id.* at 2-17.[37]

83. EPA also explained there were few possible changes that would warrant a different determination. For example, with respect to compensation measures, EPA found "there are significant challenges regarding the potential efficacy, applicability, and sustainability of compensation measures proposed by PLP for use in the Bristol Bay region . . . ." *Id.* at 2-13. But while most "compensatory mitigation efforts involve restoration and enhancement of waters that have potential for improvement in ecological services, . . . the waters of the Bristol Bay watershed are already among the most productive in the world." *Id.* EPA Region 10 in fact saw "little likelihood that human activity could

---

[37] The potential disposal site is approximately 268 square miles. Proposed Determination at 2-18.

improve upon the high-quality natural environment in the Bristol Bay watershed that nature has created and that has thus far been preserved." *Id.*

### PLP And Its Supporters' Efforts To Remove The Proposed Determination

84.     In 2014, PLP launched a multi-pronged legal challenge to stop EPA.  First, in May 2014, PLP challenged EPA's authority to use the Section 404(c) process prior to PLP's submission of a permit application.  *See Pebble Ltd. P'ship v. United States EPA*, 155 F. Supp. 3d 1000 (D. Alaska 2014).  After the district court held that EPA's initiation of the 404(c) process did not constitute final agency action, the Ninth Circuit affirmed. *Pebble Ltd. P'ship v. U.S. EPA*, 604 F. App'x 623 (9th Cir. 2015).

85.     Then, in September 2014, PLP sued EPA again, alleging the agency had used advisory committees to assist in the Section 404(c) process without complying with federal law requirements.  *Pebble Ltd. P'ship v. EPA*, 310 F.R.D. 575, 578 (D. Alaska 2015).  And finally in October 2014, PLP sued EPA for alleged violations of the Freedom of Information Act.  *Pebble Ltd. P'ship v. United States EPA*, No. 3:14-CV-0199- HRH, 2016 WL 128088 (D. Alaska Jan. 12, 2016).

86.     In May 2017, less than five months after the inauguration of President Trump, PLP and EPA entered a Settlement Agreement to resolve the remaining litigation. Under the terms of the agreement, EPA committed to "commence a process to propose to withdraw the currently pending proposed determination."[38]

---

[38]  Settlement Agreement between EPA and PLP (May 11, 2017), ¶ III.A.5, *available at* https://www.epa.gov/newsreleases/epa-and-pebble-limited-partnership-reach-settlement-agreement.

87.    As was required by the Settlement Agreement, on July 19, 2017, EPA issued a proposal to withdraw the 2014 Proposed Determination.[39]  EPA's proposal to withdraw made clear that "initiation of the Section 404(c) process did not prohibit PLP from filing a permit application and the Army Corps could have processed such a permit applicable while a Section 404(c) review was ongoing."[40]  Nevertheless, EPA went through with the Proposal to Withdraw, asserting it "would remove any uncertainty, real or perceived, about PLP's ability to submit a permit application and have that permit application reviewed."[41]

88.    With its Proposal to Withdraw, EPA also opened a public comment period, but it limited its request for comments to the reasons the agency offered for withdrawing the Proposed Determination.[42]  EPA received more than a million comments, an overwhelming majority of which opposed EPA's proposal to withdraw the Proposed Determination.[43]

---

[39]  EPA, Proposal to Withdraw Proposed Determination to Restrict the Use of an area as disposal Site; Pebble Deposit Area, Southwest Alaska, 82 Fed. Reg. 33,123 (July 19, 2017) ("Proposal to Withdraw").

[40]  *Id.* at 33,124.

[41]  *Id.*

[42]  *Id.*

[43]  *See* EPA, News Release, EPA Administrator Scott Pruitt Suspends Withdrawal of Proposed Determination in Bristol Bay Watershed, Will Solicit Additional Comments (Jan 26, 2018), https://www.epa.gov/newsreleases/epa-administrator-scott-pruitt-suspends-withdrawal-proposed-determination-bristol-bay.

## EPA Suspends The Withdrawal Process

89.     On February 28, 2018, EPA issued formal notice of its decision to leave the "Determination in place pending further consideration by the Agency of information that is relevant to the protection of the world-class fisheries contained in the Bristol Bay watershed."[44]

90.     In the press release accompanying this decision, then-EPA Administrator Scott Pruitt stated:  "[I]t is my judgment at this time that any mining projects in the region likely pose a risk to the abundant natural resources that exist there.  Until we know the full extent of that risk, those natural resources and world-class fisheries deserve the utmost protection."[45]  He further observed PLP's "application must clear a high bar, because EPA believes the risk to Bristol Bay may be unacceptable."[46]

91.     Administrator Pruitt gave two reasons for his decision:  First, he explained that "EPA has serious concerns about the impacts of mining activity in the Bristol Bay Watershed," and "[f]rom public comments to community meetings, stakeholders stressed the importance of balancing a singular mine venture with the risk to one of the world's

---

[44]  Notification of Decision Not to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska, 83 Fed. Reg. 8668 (Feb. 28, 2018) ("Suspension Decision").

[45]  EPA, News Release, EPA Administrator Scott Pruitt Suspends Withdrawal of Proposed Determination in Bristol Bay Watershed, Will Solicit Additional Comments (Jan 26, 2018), https://www.epa.gov/newsreleases/epa-admnistaror-scott-puritt-suspends-withdrawal-proposed-determination-bristol-bay ("Suspension Press Release").

[46]  *Id.*

largest commercial fisheries."[47]  Second, "for EPA not to express an environmental position at this stage would be disingenuous."[48]  The decision thus "demonstrate[d] the Agency's commitment to both the rule of law and process, and upholding the EPA's core mission of environmental stewardship."[49]

## The Army Corps' Permitting Process Begins

92.    Meanwhile, and in parallel to EPA's Section 404(c) process, PLP submitted its Pebble Mine permit application to the Army Corps in December 2017.[50]

93.    PLP's application is for a much larger mining pit and with much more mining activity in a 20-year period than EPA considered in the .25 billion scenario in the Watershed Assessment.

94.    Notably, ***PLP's 2018 Amended 404 permit application proposed a mine with a milling rate of 180,821,000 tons of ore per day—that is six times larger than the milling rate in the .25 mining scenario that EPA found to pose unacceptable adverse effects***.[51]

---

[47]  *Id.*

[48]  *Id.*

[49]  *Id.*

[50]  2017 PLP Permit Application.

[51]  PLP, Project Description at 1 (Oct. 2018), *available at* https://www.poa.usace.army.mil/Portals/34/docs/regulatory/plp/12_22_2017_POA_2017-271_DA_Application_Pebble_Limited_Partnership_Attach_D.pdf?ver=2018-01-05-115828-333.

CASE NO. 3:19-cv-00268-JWS
*TROUT UNLIMITED v. U.S. EPA, et al.*                                                  COMPLAINT FOR DECLARATORY
Case 3:19-cv-00268-SLG   Document 1   Filed 10/09/19   Page 36 of 55

95. PLP's permit application triggered the Section 404 permitting process, which is administered by the Corps.

96. Concurrent with the Corps' permitting process, pursuant to the National Environmental Policy Act ("NEPA"), the Corps issued a Draft Environmental Impact Statement ("DEIS") in February 2019.[52]

97. On July 1, 2019, EPA submitted comments on the Corps' DEIS, commenting "[b]ecause the nature and extent of the proposed discharges reflect some of the most highly significant and complex discharge activities with the potential for serious adverse impact contemplated by the Guidelines, the level of information, evaluation, and documentation necessary for this project to demonstrate compliance with the Guidelines is significant."[53]

98. EPA stated in its comments that the "PN, DEIS, and supporting documents do not contain sufficient information to support a reasonable judgment that the proposed discharges will comply with the Guidelines."[54] EPA expressed concern "regarding the extent and magnitude of the substantial proposed impacts to streams, wetlands, and other aquatic resources that may result, particularly in light of the important role these resources

---

[52] U.S. Army Corps of Engineers, Draft Environmental Impact Statement for the Pebble Project, CEQ Number 20190018; EPA Region 10 Project Number 18-0002-COE (Feb. 2019), *available at* https://pebbleprojecteis.com/documents/eis.

[53] Letter from Regional Administrator Hladick to Colonel Borders, POA-2017-0271 (July 1, 2019), *available at* https://www.epa.gov/sites/production/files/2019-07/documents/epa-comments-draft-404-permit-pebble-project-07-01-2019_0.pdf.

[54] *Id.*

Case 3:19-cv-00268-SLG   Document 1   Filed 10/09/19   Page 37 of 55

play in supporting the region's valuable fishery resources."[55]  Moreover, EPA found *the PLP project "may have substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds, which are aquatic resources of national importance*."[56]

99.    Accordingly, EPA elevated the permit review through a "may effect" 3(a) letter under Section 404(q) of the CWA,[57] which provides the Regional Administrator 25 calendar days after the public comment period to notify the District Engineer at the Corps the discharge will have substantial and unacceptable impact on aquatic resources of national importance.[58]

## Alaska Governor Dunleavy Meets With President Trump

100.    On June 26, 2019, while traveling to the G20 summit in Japan, President Trump stopped in Anchorage, Alaska and met with Alaskan Governor Michael Dunleavy on Air Force One.  During that meeting, the two discussed Pebble Mine.[59]

---

[55]  *Id.*

[56]  *Id.* (emphasis added).

[57]  *Id.*

[58]  Memorandum of Agreement Between the Department of the Interior and the Department of the Army (1992), *available at* https://www.epa.gov/sites/production/files/2015-06/documents/1992_moa_404q.pdf.

[59]  Scott Bronstein, et al., *EPA dropped salmon protection after Trump met with Alaska governor*, CNN (Aug. 9, 2019), https://www.cnn.com/2019/08/09/us/epa-alaska-pebble-mine-salmon-invs/index.html.

101.    Emerging from the meeting, Governor Dunleavy said the President assured him that he was "doing everything he can to work with us on our mining concerns."[60]

102.    Although Governor Dunleavy claims publicly he is neutral on the Pebble Mine project, his background and actions betray otherwise.  The governor's 2018 campaign disclosure reports show he received substantial contributions from individuals associated with PLP, including notably the chairman of PLP's board, John Shively, and PLP's CEO, Tom Collier.[61]

103.    Moreover, one of Governor Dunleavy's first major public appearances after being elected, on November 6, 2018, was a speech to the Alaska Miners Association, in which he declared,  "Alaska is open for business."[62]  Although Governor Dunleavy did not mention Pebble Mine specifically, he singled out campaign contributor and PLP Chairman, Mr. Shively, for recognition: "I want to recognize somebody else who is sitting here somewhere, I think.  Is John here? John Shively?  John Shively!"[63]

---

[60]  Governor Mike Dunleavy, Facebook, https://www.facebook.com/watch/?v=2069702619998758  (June 26, 2019); Scott Bronstein, et al., *EPA dropped salmon protection after Trump met with Alaska governor*, CNN (Aug. 9, 2019), https://www.cnn.com/2019/08/09/us/epa-alaska-pebble-mine-salmon-invs/index.html.

[61]    Ala. Pub. Offices Comm'n, APOC Online Reports, Campaign Disclosures, https://aws.state.ak.us/ApocReports/CampaignDisclosure/CDForms.aspx.

[62]  Elizabeth Harball, et al., *What does the Dunleavy administration mean for the proposed Pebble Mine?* Alaskapublic.org (Dec. 20, 2018), https://www.alaskapublic.org/2018/12/20/what-does-the-dunleavy-administration-mean-for-the-proposed-pebble-mine/.

[63]  *Id.*

104.    On March 1, 2019, Governor Dunleavy also sent a letter to President Trump

objecting to the use of the "preemptive veto" under the 404(c) process in Alaska, stating it

"handicapped" natural resource development.[64]  He even cited Pebble Mine as the "poster

child" for how the 404(c) process has "handicapped" natural resource development in

Alaska.[65]

105.    Consistent with his ties to PLP, in July 2019, Governor Dunleavy also wrote

to Wheaton Precious Metals Corp. (a potential investor in the Pebble Mine), stating "the

State has a keen interest in the project" and "is encouraged and supportive of [Wheaton's]

decision to invest in Alaska."  The governor added that "[a] fair, efficient, and thorough

permitting process, without interference and threats from project opponents, is essential to

the future economic growth of Alaska" and stated he is "committed to making that happen,

and once appropriate permits are granted, I am equally committed to removing obstacles

that would hinder immediate construction."[66]

106.    The same day Governor Dunleavy met with President Trump, EPA General

Counsel Leopold released a Memorandum "directing Region 10 to continue its

---

[64]  Letter from Governor Michael J. Dunleavy to President Donald J. Trump (March 1, 2019), *available at* https://www.documentcloud.org/documents/5976294-030119-DunleavyLetterToTrump.html.

[65]  *Id.*

[66]  Letter from Governor Michael J. Dunleavy to Randy Smallwood, President and CEO, Wheaton Precious Metals Corp. (July 30, 2019), *available at* https://www.alaskapublic.org/wp-content/uploads/2019/08/20190730_WheatonLetter_Dunleavy.pdf.

deliberations regarding whether to withdraw the 2014 Proposed Determination or, alternately, decide to leave the 2014 Proposed Determination in place."[67]

107.   And the very next day, on June 27, 2019, senior EPA officials in Washington, D.C. summoned scientists and other staffers to an internal videoconference to inform them of the agency's plan to withdraw its Proposed Determination regarding Pebble Mine. During that videoconference, Mr. Leopold said a decision had been made to withdraw the Proposed Determination and no further consideration of the matter was necessary.

108.   The news came as a "total shock" to top EPA scientists.[68]

### EPA Withdraws The Proposed Determination

109.   On July 30, 2019, Regional Administrator Hladick gave public notice of his decision to withdraw EPA's 2014 Proposed Determination.[69]   The notification was published in the *Federal Register* on August 30, 2019.  EPA, Notification of Decision to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska, 84 Fed. Reg. 45,749 (Aug. 30, 2019).

---

[67]   Memorandum from Mathew Z. Leopold, General Counsel, EPA, to Chris Hladick, Regional Administrator, Reg. 10, EPA at 2-3 (undated).

[68]   Scott Bronstein, et al., *EPA dropped salmon protection after Trump met with Alaska governor*, CNN (Aug. 9, 2019), https://www.cnn.com/2019/08/09/us/epa-alaska-pebble-mine-salmon-invs/index.html.

[69]   EPA, Notification of Decision to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska (July 30, 2019) (pre-publication version); EPA, News Release, EPA Withdraws Outdated, Preemptive Proposed Determination to Restrict Use of the Pebble Deposit Area as a Disposal Site (July 30, 2019), https://www.epa.gov/newsreleases/epa-withdraws-outdated-preemptive-proposed-determination-restrict-use-pebble-deposit.

110.	EPA's August 30, 2019, withdrawal of the Proposed Determination constituted final agency action pursuant 40 C.F.R. § 231.5(c)(1). *See id.* at 45,756.[70]

111.	EPA provided two reasons for Withdrawal Decision. EPA first stated that "now is the appropriate time to complete the withdrawal of the Proposed Determination in light of developments in the record." *Id.* at 45,749. Specifically, EPA stated "the Corps' DEIS includes significant project-specific information that was not accounted for in the 2014 Proposed Determination and, based on that information, the Corps has reached preliminary conclusions that in certain respects conflict with preliminary conclusions in EPA's 2014 Proposed Determination." *Id.* at 45,752. EPA also stated it "is not seeking to resolve any conflicting preliminary conclusions of the Agencies or conclusively address the merits of the underlying technical issues." *Id.* at 45,754.

112.	In other words, EPA reasoned that the existence of conflicting conclusions on the merits was a proper basis for it to withdraw the Proposed Determination, yet it refused to assess the conflicting information.

---

[70] EPA regulations provide that, when "the Regional Administrator, or his designee, decides to withdraw the proposed determination, he shall promptly notify the Administrator . . . who shall have 10 days from receipt of such notice to notify the Regional Administrator of his intent to review such withdrawal." 40 C.F.R. § 231.5(c). "If the Administer does not notify him, the Regional Administer shall give notice at the withdrawal of the proposed determination as provided in § 231.3(d). *Such notice shall constitute final agency action.*" *Id.* § 231.5(c)(1) (emphasis added). Here, the Withdrawal Decision states "[t]he General Counsel, who is the delegated official to act for the Administrator, did not notify the Regional Administer of his intent to review as described in the regulations, thus ending the regulatory process." Withdrawal Decision, 84 Fed. Reg. at 45,756.

113.    EPA further explained that in light of purported "new information" generated since 2014, PLP's submitted permit application, and a significant expansion of the record, the Proposed Determination "has effectively grown stale." *Id.* at 45,743.

114.    Although EPA recognized it had the authority simply to extend the 404(c) deadlines—including keeping the Proposed Determination in place—upon a showing of "good cause," 40 C.F.R. § 231.8, EPA asserted it already suspended the process during the timelines set forth in the 2017 settlement agreement. Withdrawal Decision at 45,753. And EPA further stated "extensions authorized under 40 CFR § 231.8 were not intended to allow for long-term gaps, as in this case, that could result in decision-making without the full record." *Id.*

115.    But the rationale presented by EPA did not address the fact that less than a year earlier, the agency had found "good cause" to "allow for an additional public comment period and to align with the timeframes established in the settlement agreement," meaning good cause exists at least until a FEIS is completed. Suspension Decision, 83 Fed. Reg. at 6,871.

116.     The second reason EPA offered for its Withdrawal Decision was "the availability of processes for EPA to address record issues with the U.S. Army Corps." Withdrawal Decision at 45,749. EPA stated that "the appropriate sequencing is to resolve technical issues during the Corps' permitting process rather than through a separate 404(c) process." *Id.* at 45,754. EPA noted its continued cooperation under the 404(q) process led by the Corps and further stated that it "believes it is appropriate to defer to the Corps' decision-making process to sort out the information" and the "Corps should have the first

CASE NO. 3:19-cv-00268-JWS                                                    COMPLAINT FOR DECLARATORY
*TROUT UNLIMITED V. U.S. EPA, ET AL.*

opportunity to consider project-specific information here without having to contend with a 404(c) proposal." *Id.* at 45,755.

117. EPA stated that it was "not basing its decision-making on technical consideration or judgments about whether the mine proposal will ultimately be found to meet the requirements of the 404(b)(1) Guidelines or results in 'unacceptable adverse effects' under CWA section 404(c)." *Id.* at 45,756.

118. Withdrawing the Proposed Determination without any further public process, EPA stated it had "satisfied all of the procedural requirements for withdrawing a proposed determination provided in 40 C.F.R. 231.5(c)." *Id.* at 45,756.

## EPA's Withdrawal Decision Is An Irrational And Unexplained Departure From Its Long-Standing and Science-Based Judgment on Pebble Mine

119. In issuing its Withdrawal Decision, EPA did not acknowledge or explain in any way why it reversed its decision from just a year prior not to withdraw the Proposed Determination. Nor did the agency address or explain how its reversal fit with its comments on the Corps' DEIS submitted just a month before its decision that the mine would have disastrous environmental effects on Bristol Bay.

120. Indeed, ***less than one month before it issued the Withdrawal Notice***, EPA concluded and stated the Corps' DEIS did "not contain sufficient information to support a reasonable judgment that the proposed [Pebble Mine] discharges will comply with the

Guidelines" and ***the most current mining plans "may have substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds***."[71]

121.    EPA failed to consider and adequately explain why its earlier findings in the 2014 Watershed Assessment and Proposed Determination are no loner valid, especially given the dearth of any new environmental data on fish since 2014.

122.    Similarly, EPA refused to assess how any new information bore on its previous studies and comments on the proposed Pebble Mine, despite that the assessments set forth in the Watershed Assessment was conducted by a larger, more qualified, group of scientists.

123.    EPA failed to consider or explain how any conceivable mitigation measures have changed its analysis.  Nor did the agency come to grips with its earlier conclusion in the Proposed Determination that mitigation measures could not alter its conclusion that the proposed mine would wreak environmental havoc with very limited offsets because Bristol Bay is home to some of the most productive waters in the world.

---

[71] Letter from Regional Administrator Hladick to Colonel Borders, POA-2017-0271 (July 1, 2019) (emphasis added).  EPA's comments  were echoed by the U.S. Senate Appropriations Committee in a September 26, 2019 report accompanying its Fiscal Year 2020 spending bill.  In it, Senator Lisa Murkowski (R-Ala.) stressed that the Committee shares the "concerns that *the DEIS lacks certain critical information about the proposed project and related mitigation  and therefore likely underestimates  its potential risks and impacts.  Sound science must guide Federal decision making* and all gaps and deficiencies identified in comments from Federal agencies and other stakeholders, including Alaska Natives, must be fully addressed . . . . *Adverse impacts to Alaska's world-class salmon fishery and to the ecosystem of Bristol Bay, Alaska, are unacceptable*."  U.S. Dep't of the Interior, Env't, and Related Agencies Appropriations Bill, 2020, Report to Accompany S. 2580, at 87 (Sept. 26, 2019), https://www.appropriations.senate.gov/imo/media/doc/FY2020%20Interior%20Environment%20Appropriations%20Act,%20Report%20116-123.pdf (emphasis added).

124.     EPA's Withdrawal Decision also failed to explain why the agency could not keep the Proposed Determination in place while it accepted and considered "new information" generated in the context of the NEPA permitting process with the Corps. EPA's regulations implementing Section 404(c) explicitly contemplate that the administrative record for a Proposed Determination includes all information obtained during the 404(c) process as well the record of the Army Corps developed during its own permitting process. *See* 40 C.F.R. § 231.5(e).  In fact, in EPA's 2018 Suspension Decision, the agency had already found "the factual record regarding the permit application can develop notwithstanding the Proposed Determination" and that such further factual development "does not support withdrawal of the Proposed Determination at this time." Suspension Decision at 8,670.

125.     In its Withdrawal Decision, despite stating a preference for the Section 404(q) process with the Corps, EPA failed to acknowledge that it could have kept the Proposed Determination in place while it proceeded with the 404(q) process.  *See* Withdrawal Decision at 45,749 & 45,754–55.

126.     Finally, in its Withdrawal Decision, EPA failed to consider or rely on the 404(b) Guidelines regarding unacceptable adverse effects of the proposed mining project on the aquatic ecosystems at Bristol Bay, asserting instead, without legal support, that scientific and technical information "remain[s] outside the bounds of EPA's basis for its decision." *Id*. at 45,756.

127.     But, EPA already had found "mining of the Pebble deposit at any of [the proposed] sizes, ***even the smallest***, could result in significant and unacceptable adverse

effects on economically important streams, wetlands, lakes, and ponds and the fishery areas they support." Proposed Determination at ES-5 (emphasis added). Yet, the most significant "new" information that had come to light since then is that PLP's proposed mine would process *six times more* ore than the smallest mining scenario evaluated by EPA and found to be unacceptable. EPA made no attempt to reconcile its decision with these earlier findings.

128. The bottom line is that, in its Withdrawal Decision, EPA failed to provide any reasonable explanation for its profound change in policy in light of its earlier analysis and conclusions regarding the mine. The agency's unreasonable and unexplained departure from its longstanding position, based by sound scientific conclusions and policy judgments, is therefore arbitrary, capricious, and unlawful.

## FIRST CLAIM FOR RELIEF

### (Violation Of Administrative Procedure Act, 5 U.S.C. §§ 701-706)

129. TU realleges and incorporates by reference the allegations set forth in numbered paragraphs 1 through 128 of this Complaint as if fully set forth herein.

130. On August 30, 2019, EPA published in the *Federal Register* its Withdrawal Decision: Notification of Decision to Withdraw Proposed Determination to Restrict the Use of an Area as a Disposal Site; Pebble Deposit Area, Southwest Alaska, 84 Fed. Reg. 45,749.

131. The August 30, 2019, Withdrawal Decision is a final agency action.

132. EPA purported to withdraw the Proposed determination because (1) "there is new information that has been generated since 2014," and (2) "there are other processes

-46-

Case 3:19-cv-00268-SLG   Document 1   Filed 10/09/19   Page 47 of 55

available now, including the 404(q) MOA process, for EPA to resolve any issues with the Corps as the record develops."  Withdrawal Decision at 45,752–53.

133.    EPA's proffered justifications are faulty, arbitrary, and capricious and run counter to the record evidence before the agency, in violation of the APA.

134.    EPA's explanations for its Withdrawal Decision are inadequate given that the overwhelming—and still valid—evidence and analysis in EPA's 2014 Watershed Assessment, 2014 Proposed Determination, and its 2018 Suspension Decision all demonstrated the proposed Pebble Mine project would pose unacceptable adverse effects, even under the most conservative estimates of mining activity and its attendant impacts (*i.e.*, a .25-billion-ton mine).

135.    EPA failed to explain why it is now necessary to withdraw the Proposed Determination when the agency still can continue to develop (or merely supplement) the administrative record while the 404(q) permitting review process continues in parallel.  The Section 404(c) and 404(q) processes are not mutually exclusive.  Any new information obtained by EPA and the Corps since EPA issued the Proposed Determination is still part of the 404(c) record.  *See* 40 C.F.R. § 231.5(e).

136.    EPA's reasoning that 404(c) record has "effectively grown stale" is irrational, contrary to its earlier analysis and conclusions, and is not a legally sufficient reason to withdraw the Proposed Determination.

137.    Accordingly, EPA has failed to examine the relevant data and to articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.  This renders EPA's withdrawal of the 2014 Proposed

Case 3:19-cv-00268-SLG   Document 1   Filed 10/09/19   Page 48 of 55

Determination arbitrary, capricious, an abuse of discretion, and/or not in accordance with law, in violation of the APA.

138.    EPA's inadequately explained *volte face* is arbitrary, capricious, an abuse of discretion, and/or not in accordance with law, in violation of the APA.

139.    EPA's Withdrawal Decision is further devoid of consideration of whether "unacceptable adverse effect" on aquatic ecosystems would occur, in violation of EPA's own regulations, rendering the decision arbitrary, capricious, an abuse of discretion, and/or not in accordance with law.

140.    These actions have harmed TU and its members, and TU has no adequate remedy at law.

## **SECOND CLAIM FOR RELIEF**

**(Violation Of The Clean Water Act, 13 U.S.C. § 1251 *et seq*., And Administrative Procedure Act, 5 U.S.C. §§ 701-706)**

141.    TU realleges and incorporates by reference the allegations set forth in numbered paragraphs 1 through 140 of this Complaint as if fully set forth herein.

142.    Section 404(c) of the CWA authorizes the EPA Administrator to "deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines . . . that the discharge of such materials into such area will have an ***unacceptable adverse effect*** on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas."  33 U.S.C. § 1344(c) (emphasis added).

143. EPA's determination of an "unacceptable adverse effect" is governed by its own regulations implementing Section 404(c). Those regulations define "unacceptable adverse effect" as an "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e). The definition further instructs that, "[i]n evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(l) guidelines." *Id.*

144. The 404(b) Guidelines in turn prohibit the permitting of any discharge of dredged or fill material (1) if a practicable alternative to the proposed discharge would have less adverse impact on the aquatic ecosystem; (2) if the discharge will cause or contribute to significant degradation of the environment; (3) if the discharge will cause or contribute to violations of water quality standards; and (4) unless appropriate steps have been taken to minimize potential adverse impacts. 40 C.F.R. § 230.10.

145. When it withdrew the Proposed Determination, EPA improperly failed to consider the substantive findings it previously had made in support of its Proposed Determination.

146. EPA's Withdrawal Decision also does not consider, explain away, or even acknowledge the proposed mining project's "unacceptable adverse effect" on aquatic ecosystems.

147. Nor does the Withdrawal Decision consider the project's compliance with Section 404(b) Guidelines.

148. EPA unlawfully refused to "bas[e] its decision-making on technical consideration or judgments about whether the mine proposal will ultimately be found to meet the requirements of the 404(b)(1) Guidelines or results in 'unacceptable adverse effects' under CWA section 404(c)." Withdrawal Decision at 45,756. EPA wrongfully stated that such scientific and technical information "remain[s] outside the bounds of EPA's basis for its decision." *Id*.

149. EPA's Withdrawal Decision does not even acknowledge or consider that the agency had previously found—as recently as July 1, 2019—that the Pebble Mine project may have substantial and unacceptable adverse impacts on fisheries resources in the project area watersheds, or undertake any effort to explain the basis for its changed position.

150. Instead, EPA justified its decision to withdraw its Proposed Determination only on allegedly new project-specific information as well as the availability of another, non-mutually exclusive, regulatory processes. But once EPA had already initiated the Section 404(c) process, EPA was required, but failed, to consider compliance with the Section 404(b) Guidelines and whether the project would have unacceptable adverse effects.

151. EPA's refusal to consider these factors in its Withdrawal Decision rendered EPA's action arbitrary, capricious, an abuse of discretion, and/or not in accordance with law.

152. EPA's actions have harmed TU and its members, and TU has no adequate remedy at law.

## PRAYER

In view of the foregoing, TU respectfully requests this Court to recognize the basic science and common sense underlying the original position of EPA and to hold, through the declaratory and injunctive relief requested below, that EPA acted in violation of the APA when it withdrew the Proposed Determination intended to protect the Bristol Bay watershed. In doing so, TU respectfully implores the Court to recognize a fundamental truth already known well by the fishermen of Trout Unlimited:

"The earth does not belong to man; man belongs to Earth. Man did not weave the web of life; he is merely a strand in it. Whatever he does to the web, he does to himself."[72]

WHEREFORE, TU respectfully requests the Court:

1) Enter a declaratory judgment that EPA's Withdrawal Decision runs counter to evidence before EPA and is inadequately supported with a rational connection between the facts found and decision made, in violation of the APA;

2) Enter a declaratory judgment that the Withdrawal Decision constitutes an unreasonable and unexplained departure from existing policy, in violation of the APA;

3) Enter a declaratory judgment that EPA's failure to consider "unacceptable adverse effect" on aquatic ecosystems as well as compliance with the 404(b) Guidelines, was not in accordance with the Clean Water Act, and in violation of the APA;

---

[72] Prof. Ted Perry, attributing the words to Chief Seattle of the Suquamish Tribe, 1854.

4) Enter an order vacating the Withdrawal Decision and directing EPA to either leave the Proposed Determination in place or provide adequate explanation for withdrawal of the Proposed Determination;

5) Issue injunctive relief as appropriate to protect Bristol Bay against threats posed by mining and associated activities, causing irreparable harm;

6) Award TU its fees, costs, expenses, and disbursements, including reasonable attorneys' fees, associated with this litigation; and

7) Grant such other, further, and additional relief as the Court deems necessary, just, and proper.

Dated:  October 9, 2019

By:  *s/ Austin Williams*
Austin Williams (AK Bar No. 0911067)
TROUT UNLIMITED
3105 Lake Shore Drive, Suite 102B
Anchorage, AK 99517
Tel.:   907.227.1590
Austin.Williams@tu.org

Paul A. Werner*
Steven P. Hollman*
Abraham J. Shanedling*
Rachelle P. Bishop*
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, Suite 100
Washington, D.C. 20006-6801
Tel.: (202) 747-1900
pwerner@sheppardmullin.com
shollman@sheppardmullin.com
ashanedling@sheppardmullin.com
rbishop@sheppardmullin.com

*Pro hac vice* application to be filed

*Attorneys for Plaintiff*
Trout Unlimited

# CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2019, a copy of the foregoing Complaint for Declaratory and Injunctive Relief was served in compliance with Federal Rule of Civil Procedure 4, to the following parties:

**U.S. Environmental Protection Agency**
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

**Andrew Wheeler, Administrator**
U.S. Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

**Matthew Z. Leopold, General Counsel**
U.S. Environmental Protection Agency
Office of General Counsel 2310A
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

**Chris Hladick, Region 10 Regional Administrator**
U.S. Environmental Protection Agency Region 10
21-B03
1200 Sixth Avenue
Seattle, WA 98101

Dated:  October 9, 2019                                         *s/ Austin Williams*
                                                                Austin Williams